# 14-2459

*To Be Argued By*:
MICHAEL P. CANTY

# United States Court of Appeals

## For the Second Circuit

❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JACOB VIZEL,

*Defendant,*

BENJAMIN J. TURNER,

*Defendant-Appellant.*

**On Appeal From The United States District Court
For The Eastern District of New York**

**BRIEF AND APPENDIX FOR THE UNITED STATES**

KELLY T. CURRIE,
*Acting United States Attorney,
Eastern District of New York.*

SUSAN CORKERY,
MICHAEL P. CANTY,
 *Assistant United States Attorneys,
 Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................ii

PRELIMINARY STATEMENT...........................................1

STATEMENT OF FACTS.............................................3

    I.    The Trial..............................................3

    II.   The Sentencing.........................................9

          A.    The PSR............................................9

          B.    The Sentencing....................................10

ARGUMENT:  TURNER'S SENTENCE WAS REASONABLE....................15

          A.    The Reasonableness Standard.....................15

          B.    The Sentence Imposed Was Substantively

              Reasonable......................................17

CONCLUSION....................................................21

ii

TABLE OF AUTHORITIES

Page

CASES

Gall v. United States,
   552 U.S. 38 (2007)...................................... 15, 16

Rita v. United States,
   127 S. Ct. 2456 (2007)..................................... 16

United States v. Cavera,
   550 F.3d 180 (2d Cir. 2008)......................... 15, 16, 17

United States v. Dorvee,
   616 F.3d 174 (2d Cir. 2010)................................ 15

United States v. Douglas,
   713 F.3d 694 (2d Cir. 2013)................................ 16

United States v. Ebbers,
   458 F.3d 110 (2d Cir 2006)............................. 18, 19

United States v. Fernandez,
   443 F.3d 19 (2d Cir. 2006)............................. 15, 18

United States v. Legros,
   529 F.3d 470 (2d Cir. 2008)................................ 17

United States v. Rigas,
   490 F.3d 208 (2d Cir. 2007)................................ 16

United States v. Rigas,
   583 F.3d 108 (2d Cir. 2009)................................ 16

United States v. Trupin,
   475 F.3d 71 (2d Cir. 2007),
   vacated on other grounds,
   532 U.S. 1089 (2008)...................................... 21

United States v. Verkhoglyad,
   516 F.3d 122 (2d Cir. 2008)................................ 15

United States v. Villafuerte,
   502 F.3d 204 (2d Cir. 2007)................................ 15

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 14-2459

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

JACOB VIZEL,

<u>Defendant</u>,

BENJAMIN J. TURNER,

<u>Defendant-Appellant</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Benjamin J. Turner appeals from a judgment of
conviction, entered on July 3, 2014, in the United States
District Court for the Eastern District of New York (Block, J.),
convicting him, after a jury trial, of conspiracy to commit wire
and bank fraud, in violation of 18 U.S.C. § 1349, bank fraud, in
violation of 18 U.S.C. § 1344, and aggravated identity theft, in

2

violation of 18 U.S.C. § 1028A(a)(1). The district court sentenced Turner to concurrent terms of 50 months' imprisonment on the conspiracy and fraud counts and a consecutive 24-month term of imprisonment on the aggravated identity theft count. The court further sentenced Turner to concurrent terms of three years' supervised release and imposed $231,367 in restitution as well as a $300 special assessment.

On appeal, Turner argues that his below-Guidelines sentence was substantively unreasonable.

For the reasons set forth below, the sentence should be affirmed.

<u>STATEMENT OF FACTS</u>

I.   <u>The Trial</u>

Turner, a licensed real estate attorney in the State of New York, controlled Four Dolphins Corporation ("Four Dolphins").  (A 17, 33-34).[1]  From May 2006 until approximately November 2008, Turner engaged in a mortgage fraud scheme related to a residential property located at 1678 Madison Place, Brooklyn, New York ("1678 Madison Place").  The scheme involved stealing a person's identity, forging documents, submitting false mortgage documents, and stealing hundreds of thousands of dollars from banks.  (PSR ¶¶ 9-11).

In June 2006, Dana and Michael Marano traveled from Florida to New York to learn about a potential real estate investment.  Michael Marano explained to his daughter Dana that he had engaged in prior real estate transactions with Turner.  (T 85-86).  When they arrived in New York, Dana and Michael Marano traveled to the Turner's law office in Brooklyn and were directed to a basement office that Dana described as "very empty, like they were in the process of moving."  (T 87).  Dana Marano noted that "it [didn't] feel right. It [didn't] feel professional."  (T 88).  Once in the office, unknown members of

---

[1]   Parenthetical references to "A" and "GA" are to Turner's appendix and the government's appendix, respectively. References to "T" are to the trial transcript.

Turner's scheme presented Dana Marano with paperwork to sign. No one explained or read the documents to Dana Marano at the time of signing; instead, they just hastily directed her to "initial, initial, initial sign, sign." (T 89-90). Unbeknownst to Dana Marano, among the paperwork she signed was a power of attorney designation giving Abraham Hoschander ("Hoschander") the authority to purchase real estate on her behalf. (T 98-99; A 29-31). Dana Marano never met Hoschander or gave him permission to carry out real estate transactions on her behalf. (T 90, 97).

When Dana Marano returned to Florida, she decided that she did not want to be involved in any real estate investment with Turner and asked her father to contact Turner. (T 90-91). Marano contacted Turner and explained to Turner that his daughter was not interested in going forward and demanded that Turner shred the documents that Dana Marano had signed. (T 91, 149-50). Turner falsely claimed to Michael Marano that Dana Marano's credit was not good enough but nevertheless agreed to shred the paperwork, which he did not do. (T 149-50).

On July 5, 2006, after successfully and falsely acquiring a power of attorney from Dana Marano, Turner had Hoschander purchase 1678 Madison Place in Dana Marano's name for $530,000. Dana Marano had no knowledge of the transaction. (A 27-28). Hoschander used the power of attorney, which Dana

Marano unknowingly signed, at the closing, and Turner paid Hoschander for his services. (A 33-34; T 191). Turner paid for the property in full out of his Four Dolphins account. (T 71). In order to make it appear that Dana Marano financed the purchase of 1678 Madison Place, Turner prepared fraudulent loan documents claiming that Dana Marano had borrowed $570,000 from Four Dolphins to purchase the property at a rate of 12% interest. (A 29-31).

Approximately one year later in May 2007, Turner enlisted the assistance of Charles Brown ("Brown"), a real estate appraiser, to secure a fraudulent appraisal for 1678 Madison Place. (T 289; A 35). Brown testified that Turner "insisted on a value between 850 and $900,000." (A 35). Brown explained to Turner that an appraisal that high would not be accepted by the banks but that he would attempt to "bring [the appraisal] in as high as [he] could." (Id.). Brown inflated the value of the property by relying on comparable properties that were, in actuality, not comparable. (T 295). For example, Brown lied about the square footage, condition, and amount of rooms in other properties that had recently sold for higher prices to make them appear comparable to 1678 Madison Place. (T 298). Ultimately, Brown falsely appraised the property for $825,000. (T 294). Turner paid Brown $1,500 for providing the falsely inflated appraisal. (T 291-92).

Unable to sell the property without Dana Marano's consent, and knowing that Dana Marano was unaware of the original purchase, Turner created another power of attorney designation form and forged Dana Marano's initials and signature. (T 103-05, 454-56). In order to authenticate the forged document, Turner also forged the signature and notary stamp of the listed notary public. (T 454-56).

Next, to successfully complete the sale, Turner enlisted the assistance of Jacob Vizel ("Vizel"). In June 2007, Vizel recruited Leana Shevchuk ("Shevchuk") as a straw purchaser for 1678 Madison Place (T 384-85) and real estate attorney Michael Garber ("Garber") to represent Shevchuk at the closing (A 39-40). Shevchuk testified that Vizel explained to her that she and Vizel would purchase properties together, including 1679 Madison Place, in Shevchuk's name, fix and sell the properties and then share in the profit. (T 386). Vizel also told Shevchuk that she needed to sign the paperwork because she had good credit. (Id.). Shevchuk further testified that she signed various documents that were not explained to her. (T 387-88). Shevchuk admitted that the mortgage loan documents submitted on her behalf to Wells Fargo and National City Bank contained a number of material misrepresentations. (T 390-91). For example, the mortgage loan application indicated that Shevchuk earned $11,485 per month and had over $275,000 in assets.

Shevchuk testified that she earned only $40,000 per year and had no assets in the bank. (T 391).

On June 12, 2007, Turner, using the forged Dana Marano power of attorney, sold 1678 Madison Place to Shevchuk for $800,000. (T 434). Garber testified that Turner represented Four Dolphins at the closing. (T 446). At the closing, Turner submitted a letter to the representative for Wells Fargo and National City Bank which indicated that Dana Marano owed Four Dolphins $633,000 for a principal loan amount of $570,000 and interest and penalties for failing to make a payment on the loan. Wells Fargo released funds in the amount of $533,850, and National City Mortgage released funds in the amount of $182,660 to Turner. (A 37). Turner then directed the distribution of the mortgage proceeds, which included $633,000 payment to himself at Four Dolphins. (T 368-69).

In order to mislead the closing attorney that Shevchuk was a bona fide purchaser, Turner and his co-conspirators faxed a copy of a forged check in the amount of $71,237, which purported to be a down payment on the property by Shevchuk to Dana Morano. (T 370, 373). Dana Marano never saw this check. (T 111). David Nummey, an investigator for the New York State Department of Financial Services, testified that based on his comparison of check numbers, the $71,237 check was a forged check. (T 472-75).

Ultimately, the mortgage went into default. (T 399). Timothy Lockwood, a financial crimes consultant for Wells Fargo, testified that Wells Fargo sustained a loss of approximately $239,000. (T 356-57).

In January 2010, Dana Marano received a letter from the IRS informing her that she owed a tax liability in the amount of $327,000 for the purchase and sale of 1678 Madison Place. (T 93). After receiving the IRS letter, Marano contacted her father who in turn contacted Turner, explaining that Dana Marano would have to alert the authorities if Turner did not pay the taxes. (T 85, 151-52).

At trial, the government called Kent Hokai ("Hokai"), a former employee of Turner. Hokai agreed to record conversations with Turner. In one such recording, Turner acknowledged he was contacted by Michael Marano after Dana Marano received the tax liability letter from the IRS. On the recording Turner further admitted that he and his co-conspirators bought the property in Dana Marano's name. Turner claimed to Hokai that he instructed Michael Marano to give the IRS the name and social security number of another member of the conspiracy and explain to the IRS that Dana Marano was not responsible for the tax liability. (T 265; A 10).

II. <u>The Sentencing</u>

    A.   <u>The PSR</u>

       In anticipation of sentencing, the United States Probation Department prepared a presentence investigation report ("PSR") providing for a total offense level of 39, resulting in an estimated Guidelines sentencing range of 262 to 327 months, given Turner's criminal history category level of I. (PSR ¶¶ 38, 41, 82).[2] This level was arrived at by employing a base offense level of seven, pursuant to USSG § 2B1.1(a)(1),[3] which was enhanced by 20 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(K), given a calculated loss of $7,455,975.70 and enhanced by two levels, pursuant to U.S.S.G. 2B1.1(b)(2)(A)(i) because the conspiracy involved the defrauding of at least ten victims. (PSR ¶¶ 20-23). The PSR employed three additional two-level enhancements for using a shell corporation (U.S.S.G. § 2B1.1(b)(10)(C)), deriving more than $1,000,000 in gross receipts from financial institutions (U.S.S.G.

---

    [2]   A copy of the PSR has been sent to the Court under seal along with the district court's statement of reasons ("SOR").

    [3]   Counts One and Two were grouped pursuant to U.S.S.G. § 3D1.2(d) and the higher offense level Guideline was employed, pursuant to U.S.S.G. § 3D1.1(b). (PSR ¶ 32). With respect to Count Three, USSG §2B1.6 directs that the guideline sentence is the term of imprisonment required by statute, two years, and Chapters Three and Four shall not apply to that count of conviction. (PSR ¶ 31).

§ 2B1.1(b)(16)(A)), and abuse of a position of trust (U.S.S.G. § 3B1.3). (PSR ¶¶ 24, 25, 28). The PSR also applied a four-level enhancement for Turner's role as an organizer or leader in the offense (U.S.S.G. § 3B1.1(a)). (PSR ¶ 27).

In a March 10, 2014 letter, Turner objected to the description of the offense conduct outlined in the PSR as well as some Guidelines calculations. (A 45-47). Specifically, Turner objected to the loss amount and fraudulent conduct regarding twenty other properties that were listed in the PSR. (A 45-46). Turner claimed that the PSR should have taken into consideration only the loss amount of $231,367 established at trial and that the PSR should not have included the loss value enhancement of the 20 other properties or "multiple victims enhancement." (A 46). Turner further objected to the two-point enhancements for receiving more than $1 million from a financial institution, his leadership role, and his abuse of position of trust. (A 46-47).

B.    The Sentencing

The district court conducted sentencing hearings on May 21, June 17 and June 25, 2014, to consider, among other things, Turner's various objections to the PSR. (GA 1-47; A 97-133).

At the outset of the May 21, 2014, sentencing hearing the court expressed its concern with a "guideline sentence . . .

driven by dollars, whether it's intended loss or actual loss
. . . because they've been roundly criticized." (GA 6). To
that end the court stated, "the ultimate responsibility of the
court [is] to sentence somebody in a realistic way to a term of
imprisonment that's sufficient but not greater than necessary to
meet the ends of sentencing." (Id.). The court further noted
that since his arrest Turner had been on pre-trial release
without incident and that "show[ed] some sort of a sensitivity
to rehabiliting himself." (GA 9-10).

The court then addressed Turner's objections.
Specifically, Turner again objected to the inclusion of 20 other
instances of mortgage fraud resulting in seven million dollars
of loss as relevant conduct in calculating the sentence.
(GA 13). The parties agreed to adjourn and continue the
sentencing hearing on June 17, 2014 so that Turner could confer
with the government and review the documents regarding the
additional losses prior to a sentencing hearing. (GA 18-20).

On June 17, 2014, the government and Turner stipulated
to a loss figure of $5,707,529 and agreed that Turner was
responsible for committing mortgage fraud involving 14
additional properties. (GA 26-28). With respect to the
Guidelines enhancements, the government stated that it could not
prove by a preponderance of the evidence that there were ten or
more victims or that Turner personally gained more than

$1 million from financial institutions. (GA 28, 32). The parties agreed that a two point enhancement for the use of a shell corporation to facilitate the fraud applied. (GA 29). The parties further agreed two-point enhancements for Turner's leadership role and the use of a specialized skill, namely Turner's law license, applied. (GA 32-37).

The court noted that it had presided over the trial and listened carefully to all of the evidence. (GA 31). The court further noted that Turner's criminal conduct was all "part of a common scheme over a period of years and Mr. Turner was the hub" of the scheme. (Id.). The court further expressed concern over how much money Turner personally derived from the scheme. The hearing was adjourned until June 25, 2015 for the parties to determine how much money Turner personally derived from the criminal conspiracy.

On June 25, 2014, after hearing from both the government and Turner, the court found that Turner was responsible for $5.5 million in losses. (A 98-100). The court further found that Turner personally received approximately $500,000 as a result of his participation in the scheme (A 100, 102) and noted that it was a considerable amount of money (A 100). As such, the court found the applicable Guidelines level to be 31 with a Guidelines Range of 108 to 135 months

based on Turner having a Criminal History Category of I. (A 108).

Next, the court considered § 3553(a) factors. Specifically the court stated, "[i]n the real world I think when we consider the § 3553(a) factors, which basically trumps everything as a practical matter, you look at the nature and circumstances of the crime [and] his personal circumstances." (A 99). In determining the appropriate sentence the court stated, "I have to really try to get a practical feel of what exactly Mr. Turner wound up doing here with his illegal activity." (A 99-100). The court acknowledged the receipt of Turner's letters including the letter from Turner's wife and, while accepting the letter, expressed concern that the letter did not "square necessarily with . . . reality." (A 103). The court then stated that it was going to sentence Turner to less than the advisory guideline range. (Id.). However, the court did express its concern over the nature of the conduct Turner engaged in stating:

> Mr. Turner might be the one who knows what that moment [was] . . . when a lawyer blessed with his license to practice law and making a . . . significant sum of money as a lawyer with all the trust that goes along with that, what was that moment when he turned the other way? . . . [I]t pains me to see Mr. Turner who decided he was going to . . . be an outright criminal and did it over and over again.

(A 113).  In reviewing the § 3553(a) factors the court stated,

> I've already trotted out the factors that
> I've considered in terms of not giving you
> an advisory guideline sentence. . . We
> talked about the amount of monies that came
> into your pocket. . .  It was a considerable
> amount of money.  This was serious criminal
> conduct over a sustained period of time. . .
> You've been compliant with your terms of
> release. . . You seem to be in the [throes]
> of rehabilitating yourself.  I consider that
> in the 3553(a) mix. You have wonderful
> family support. . . So I've considered all
> the 3553(a) factors and I think that's
> pretty clear from my comments on the record
> and everything that's transpired before us.

(A 122-23).

After considering Turner's various personal characteristics, including Turner's misuse of his public trust as a lawyer, his compliance with his terms of release and the value of rehabilitation, the court sentenced Turner to a non-Guidelines sentence of concurrent 50 months terms on the conspiracy and fraud counts, with three years of supervised release.  (A 113, 123-24).  The district court also found that a mandatory sentence of 24 months was to be added to the sentence for the Turner's conviction of aggravated identity theft, for a total of 74 months.  (A 124).  The court ordered restitution in the amount of $231,367 in connection with the mortgage fraud and imposed a special assessment of $300.  (A 124, 126).

ARGUMENT

TURNER'S SENTENCE WAS REASONABLE

Turner asserts that his sentence was substantively unreasonable in light of his age, lack of criminal record, personal characteristics and the nature and circumstances of the offense. (Br. 2). His argument is without merit.

A.    The Reasonableness Standard

This Court reviews sentences for reasonableness. See United States v. Cavera, 550 F.3d 180, 187 (2d Cir. 2008) (en banc). This standard applies "both to 'the sentence itself' and to 'the procedures employed in arriving at the sentence.'" United States v. Verkhoglyad, 516 F.3d 122, 127 (2d Cir. 2008) (quoting United States v. Fernandez, 443 F.3d 19, 26 (2d Cir. 2006)). The procedural inquiry focuses on whether the district court committed a "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence[.]" United States v. Dorvee, 616 F.3d 174, 179 (2d Cir. 2010) (quoting Gall v. United States, 552 U.S. 38, 51, (2007)(internal quotation marks omitted)).

The substantive inquiry assesses "the length of the sentence imposed in light of [§ 3553(a)] factors." United

States v. Villafuerte, 502 F.3d 204, 206 (2d Cir. 2007). When conducting the substantive review, the court looks at the totality of the circumstances, "giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of the district court." Cavera 550 F.3d at 190 (citing Rita v. United States, 127 S. Ct. 2456, 2466-67 (2007)). A district court's sentence will be set aside only "in exceptional cases where the trial court's decisions cannot be located within the range of permissible decisions." Id. at 189 (internal quotation marks omitted) (citing United States v. Rigas, 490 F.3d 208, 238 (2d Cir. 2007)); see also United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013) ("We set aside a district court's sentence as substantively unreasonable only if affirming it 'would . . . damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law.'") (quoting United States v. Rigas, 583 F.3d 108, 123 (2d Cir. 2009) (alteration in Douglas)).

In both its procedural and substantive aspects, reasonableness review employs a "deferential abuse-of-discretion standard." Gall, 552 U.S. at 41. But that standard "incorporates de novo review of questions of law (including interpretation of the Guidelines) and clear-error review of

questions of fact," <u>United States v. Legros</u>, 529 F.3d 470, 473-74 (2d Cir. 2008); <u>see also</u> <u>Cavera</u>, 550 F.3d at 187.

    B.   <u>The Sentence Imposed Was Substantively Reasonable</u>

Turner contends that his below-Guidelines sentence of 74 months "was shockingly high and unsupportable as a matter of law." (Br. 20). Turner bases this argument on his age, lack of criminal history and his difficult upbringing, which he claims the district court "rejected." This argument has no merit.

Having presided over Turner's case for over two years the district court was well familiar with Turner and the nature of the offense. Additionally, after holding a three-day sentencing hearing the court considered both the advisory Guidelines range and balanced the § 3553(a) factors in fashioning an appropriate sentence. Despite a record that fully supports the sentence imposed by the court Turner nevertheless insists was "shockingly high."

Notably, though, the arguments Turner puts forth in support of that position are the same arguments the court relied upon in granting a sentence significantly below the Guidelines. Specifically, the court noted that Turner was a low risk for recidivism due to his compliance with the terms of his pre-trial release and that he had the full support of a loving family. The court considered these factors in favor of Turner. (A 123; SOR). Thus, any claim that the court "rejected this evidence,"

(Br. 20) is without merit. See Fernandez, 443 F.3d at 32 (weight given to a § 3353 factor generally beyond appellate review).

In further support of his "shockingly high" claim, Turner cites United States v. Ebbers, 458 F.3d 110 (2d Cir 2006). Turner argues that in Ebbers, where a defendant was responsible for losses in excess of one billion dollars, the sentence imposed was "only four times longer than Turner['s]." (Br. 24). This argument is meritless. Ebbers received a lengthy 25-year sentence for criminal conduct involving securities fraud. Furthermore, Ebbers's sentence was over 18 years longer than the sentence received by Turner and six times longer than the 50-month sentence Turner received for his role in the mortgage fraud. Moreover, while the loss amounts for Turner were significantly lower than those in Ebbers, the court made it clear that its sentence was not driven by the loss calculation but rather the § 3553(a) factors. (GA 6; A 99). The court further noted the fact that Turner by all accounts was carrying out a legitimate business but still felt the need to engage in criminal conduct. (A 101-02). Finally, while the court recognized that Turner was working towards rehabilitation, the record demonstrates that specific deterrence was not a driving factor in the ultimate sentence imposed. To the extent specific deterrence was considered by the court it appears that

it was a factor the court considered in Turner's favor. The court acknowledged that Turner was in the "[throes] of rehabilitat[ion]" and therefore credited that fact in imposing a below-Guidelines sentence. (A 123).

Turner similarly references the negotiated sentence of 14 years for Jeffrey Skilling of Enron. (Br. 24). Again, Turner fails to cite to any of the factors that were considered by the sentencing court in fashioning the sentence. It should be noted however, that Skilling pled guilty and accepted responsibility for his conduct, something Turner failed to do. Moreover, Skilling was not charged with aggravated identity theft which carries a mandatory consecutive 24 month sentence.

Turner also alleges that his sentence "is patently unreasonable" because "[i]t is more than double the average fraud sentence imposed nationally or in this Circuit." (Br. 26). Coupled with this argument, Turner argues that the district court failed to consider Turner's age and empirical evidence that shows Turner's age is connected to a low risk of recidivism. Both arguments miss the mark for two reasons.

First, Turner relies on empirical data which categorizes average sentences for "fraud cases." However, this data does not provide any additional information to suggest that the cases included in the analysis carried the same factors present in Turner's case other than the fact that they were

categorized as "fraud." The data Turner cites fails to account for loss amounts, the applicability of sentencing enhancements or a careful review of the § 3553(a) factors applicable to the cases to which Turner cites. Here, Turner's case cannot and was not considered a generic "fraud" by the district court. The district court described Turner as the leader of a conspiracy that was carried on over a number of years and was responsible for stealing over $5 million through use of Turner's special skills.

Secondly, Turner's claim that the court failed to consider his age is groundless. The district court certainly was aware of Turner's age and noted that Turner committed the crimes after he had achieved professional success. He was well over 40 years old when he engaged in this extensive criminal conduct. (PSR p. 2). This Court has recognized that the low recidivism argument Turner touts is undermined significantly where a defendant began his criminal "escapades" at an older age and continued with his criminal activities thereafter. See United States v. Trupin, 475 F.3d 71, 75-76 (2d Cir. 2007), vacated on other grounds, 552 U.S. 1089 (2008).

In sum, the sentence was well below the applicable Guideline range and was the product of the district court's thorough review of the record and the pertinent § 3553(a) sentencing factors.

<u>CONCLUSION</u>

For the reasons stated above, the sentence should be affirmed in all respects.

Dated:      Brooklyn, New York
            May 15, 2015

                              Respectfully submitted,

                              KELLY T. CURRIE,
                              <u>Acting United States Attorney</u>,
                              <u>Eastern District of New York</u>.

                    By:    _____/s/_____

                              MICHAEL P. CANTY
                              Assistant U.S. Attorney

SUSAN CORKERY,
MICHAEL P. CANTY,
<u>Assistant United States Attorneys</u>,
      (<u>Of Counsel</u>).

A P P E N D I X

TABLE OF CONTENTS

Page

May 21, 2014 Hearing Transcript ...........................GA 1

June 17, 2014 Hearing Transcript ..........................GA 24

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 12-CR-00326(FLB)
                                   :
                                   :
                                   :
      -against-                    : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
BENJAMIN T. TURNER,                : Wednesday, May 21, 2014
                                   : 12:22 p.m.
         Defendant.                :
                                   :
                                   :

- - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE FREDERIC L. BLOCK
SENIOR UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York 11201
                    BY: MICHAEL P. CANTY, ESQ.
                        DAVID C. PITLUCK, ESQ.
                        Assistant United States Attorneys

For the Defendant: MIEDEL & MYSLIWIEC, LLP
                       111 Broadway
                       Suite 1401
                       New York, New York 10006
                    BY: FLORIAN MIEDEL, ESQ.

Court Reporter:     SHERRY J. BRYANT, RMR, CRR
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    sbryant102@verizon.net

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

```
                          PROCEEDINGS                      2

 1          (In open court.)

 2          (Defendant present.)

 3          COURTROOM DEPUTY:  Criminal cause for sentencing,

 4   the United States of America versus Benjamin Turner.  I ask

 5   the parties if you can state your appearances.

 6          MR. CANTY:  Michael Canty for the United States,

 7   along with David Pitluck.  Good afternoon, Your Honor.

 8          THE COURT:  Good afternoon.

 9          MR. PITLUCK:  Good afternoon.

10          MR. MIEDEL:  Good afternoon, Your Honor.  Florian

11   Miedel for Mr. Turner.

12          THE COURT:  So we have some serious matters to talk

13   about, Mr. Canty, and let me share right from the beginning

14   some of my thoughts.  Okay?

15          MR. CANTY:  Yes, Your Honor.

16          THE COURT:  We have a little difference of opinion

17   between the lawyers.  Mr. Miedel thinks I should sentence his

18   client, I think, to 23 months.

19          MR. MIEDEL:  Well, no.  The mandatory minimum on

20   Count Three is 24 months.

21          THE COURT:  Twenty-four.

22          MR. MIEDEL:  And I'm asking for a sentence a little

23   beyond that.

24          THE COURT:  Well, 24, 30 months, or something like

25   that.  The government thinks I should sentence your client to
```

PROCEEDINGS                                    3

1  at least 262 months, which is the lower level of the advisory

2  guideline range, plus an additional 24 months, which have to

3  be tacked on.  So that would be -- 284 months divided by 12

4  comes out to what, about 25 years?

5            MR. PITLUCK:  Twenty-three.

6            THE COURT:  So we have a little difference of

7  opinion.

8            MR. CANTY:  Yes, Your Honor.

9            THE COURT:  You know, Mr. Canty, I have great

10 respect for your office, but not here, okay?  I'm a little bit

11 disappointed and, being a straight-shooter, I'm going to tell

12 you exactly why.

13           MR. CANTY:  Yes, Your Honor.

14           THE COURT:  Do you really believe that any judge in

15 the United States of America would accept the government's

16 position and sentence this person to 25, 26, 27 years in jail?

17 He's done a crime and he's going to get punished, but tell me

18 whether you really believe that is what you think you would do

19 if you were wearing these robes.

20           MR. CANTY:  I think, based on the conduct of this

21 defendant, I believe that there are certain judges.  I think

22 the better question, Your Honor, though, is why the defendant

23 would think that a 24-month sentence or a little bit beyond 24

24 months --

25           THE COURT:  Let's talk about the government's

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                                    4

1   responsibility.

2               MR. CANTY:  Yes, Your Honor.

3               THE COURT:  All right?  Because I have a lot of

4   respect for your office.  And time and time again they come to

5   me and they acknowledge that when a sentencing range is driven

6   by dollars, whether it's a pump-and-dump scheme -- when you

7   just add up the numbers here by relevant conduct, it adds up

8   to huge numbers, because it's driven by that 7 million

9   dollars; right?

10              But you're the first person from the U.S. Attorney's

11  Office in a situation like this who really is telling me with

12  a straight face that he should be sentenced to more than 25

13  years in jail for this.  I would be the laughingstock of the

14  country if I did that.

15              You have a greater responsibility.  Not even the

16  Probation Department goes along with you.  They're on the high

17  end, too.  But why is it that you don't come here and say,

18  Judge, that would be unrealistic even though that's the

19  advisory guideline range?  Can you with a straight face

20  actually tell me that you think it's a fair sentence?

21              MR. CANTY:  Based on the guidelines calculation and

22  the conduct of this defendant, if Your Honor were to sentence

23  the defendant to that sentence, I don't believe it would be an

24  unreasonable sentence.

25              THE COURT:  Really?

```
                        PROCEEDINGS                        5

 1          MR. CANTY:  That being said, if the Court were to

 2   sentence him below the guidelines, I believe that there are

 3   other reasonable sentences for which the Court could sentence

 4   the defendant.

 5          THE COURT:  Like what?

 6          MR. CANTY:  I certainly don't want to bet against

 7   myself here, Your Honor, but I certainly don't think a

 8   sentence of 30 months or 36 months or even 60 months is

 9   appropriate in this case.

10          THE COURT:  Now, how about your distinguished

11   colleague, Mr. Pitluck, does he share your position that a

12   sentence of 260 -- what is it -- 266 months is appropriate?

13          MR. PITLUCK:  I do, Your Honor.

14          THE COURT:  You also feel that way as well?

15          MR. PITLUCK:  I agree that the sentence -- with what

16   Mr. Canty said, which is a sentence within that guideline

17   range is not inappropriate, given the conduct here, including

18   the abuse of trust and --

19          THE COURT:  We don't sentence murderers to that

20   range of imprisonment, rapists.  Sometimes we do, of course,

21   depending upon the circumstances.  But it's the same type of

22   sentence that we would consider for a person who killed

23   somebody.

24          MR. CANTY:  I understand, Your Honor.  And I think

25   the guidelines are what they are with these amounts for a
```

PROCEEDINGS                              6

1   reason.  I also agree with Mr. Canty's statement that there

2   are lesser sentences under the guidelines that would also be

3   appropriate in this situation.

4           THE COURT:  Well, we have now some history of

5   articulations by lots of judges and courts, the Supreme Court

6   I suspect, that says that when a guideline sentence is driven

7   by dollars, whether it's intended loss or actual loss,

8   whatever, you have to take a little look at that, because

9   they've been roundly criticized; right?  And we have a lot of

10  colleagues of mine who just don't say that's reasonable under

11  the ultimate responsibility of the Court to sentence somebody

12  in a realistic way to a term of imprisonment that's sufficient

13  but not greater than necessary to meet the ends of sentencing.

14  That's the standard.

15          So I'd like to engage you folks in a discussion to

16  see whether you really, really are serious about whether you

17  think in this case this would be an appropriate sentence.  You

18  can say yes.

19          MR. CANTY:  Your Honor, I think when we look at the

20  guidelines calculation here, the guidelines are a starting

21  point.  We're not saying that because these -- the guidelines

22  are driven by this -- the financial loss here, which is a plus

23  20, that that's what makes this an appropriate sentence.

24          What makes this an appropriate sentence, I believe,

25  are all the other mitigating -- aggravating factors here, like

PROCEEDINGS                                    7

1    the fact the defendant stole identities repeatedly.

2            THE COURT:  Well, he's going to get sentenced to 24

3    months for that.  But you do say, I'm sorry, in your

4    conclusion that the government respectfully submits that a

5    guideline sentence between 262 to 327 months, to run

6    consecutive to the mandatory 24-month sentence, is

7    appropriate, is appropriate in this case.

8            Do you really believe that?

9            MR. CANTY:  I believe if Your Honor sentenced this

10   defendant within those guidelines range with a consecutive

11   24-month sentence, that would not be an inappropriate

12   sentence.

13           THE COURT:  You're entitled to your position.  So I

14   guess you would feel that if I sentenced him to 327 months,

15   which is the high end, plus 24 months, that would be 351

16   months, right, you think that would be appropriate.  So let's

17   see, 351 divided by 12 --

18           MR. MIEDEL:  Twenty-nine years.

19           COURTROOM DEPUTY:  Twenty-nine.

20           THE COURT:  -- would be almost 30 years.  Do you

21   think that's appropriate?

22           MR. CANTY:  I think that, based on the conduct of

23   this defendant -- and certainly, I'm not the sentencing --

24           THE COURT:  You can say yes or no.

25           MR. CANTY:  But the answer is more nuanced than

PROCEEDINGS                                      8

1  that, and I don't want to --

2           THE COURT:  You didn't give any nuanced conclusion

3  in your submission.

4           MR. CANTY:  We've explained why we believe that's an

5  appropriate sentence.

6           THE COURT:  But you came to a conclusion that if I

7  sentence him to basically 30 years in jail that that would be

8  appropriate.  That's what you said.

9           MR. CANTY:  There's an argument to be made that that

10 is an appropriate sentence, in light of the --

11          THE COURT:  That's your position?

12          MR. CANTY:  Yes, in light of the defendant's

13 conduct.  There are also appropriate sentences below the

14 guidelines that certainly the government respects the

15 sentencing court's decision if the Court decides to sentence

16 the defendant to a below-guidelines sentence.

17          THE COURT:  Let's go on to see how this shakes out.

18 Mr. Miedel is biting his tongue, and I appreciate the fact

19 that you've exercised discretion and not commented.

20          So we have in my sentencing file the following

21 documents.  Let's identify them to make sure we go through the

22 necessary protocol.

23          I have a proposed order of forfeiture, and we're

24 going to talk about that, but let's put that aside

25 temporarily.  We'll get to that later since you agree that I'm

PROCEEDINGS                                        9

1  going to have to resolve that.  We have the Probation

2  Department's sentencing recommendation, which has some

3  constructive comments.  They do a very good and thorough job

4  in summing up what's in the presentence report.

5           And I take it that counsel has had the opportunity

6  to review this, since it's the Court's practice to distribute

7  it to the lawyers.

8           MR. MIEDEL:  Yes.

9           THE COURT:  So you see that the Probation Department

10 takes a somewhat different position than the government here,

11 and they recommend a very high sentence also of 144 months,

12 but that's significantly less than what the government thinks

13 is appropriate.

14           Then we have the underlying presentence report

15 that's dated January 16.  So it was prepared just a few months

16 ago.  And it indicates that the defendant has been under

17 $100,000 secured appearance bond, secured by his residence,

18 since May 8th, 2012.  That is the date of his arrest.  So he

19 hasn't been incarcerated yet.

20           MR. CANTY:  Correct.

21           THE COURT:  He's going to be now, but he hasn't been

22 incarcerated yet.  And he's been compliant, I take it, as long

23 as he's been on pretrial supervised release -- not supervised

24 release, pretrial release?

25           MR. MIEDEL:  Yes, he has.

PROCEEDINGS                                    10

1       THE COURT:  Any problems with that, Mr. Canty?

2       MR. CANTY:  No.

3       THE COURT:  You know nothing to the contrary?

4       MR. CANTY:  That is correct.

5       THE COURT:  Do you think that when we discuss

6   3553(a) factors that the fact that he's been compliant for a

7   sustained period of time that that shows some sort of a

8   sensitivity to rehabilitating himself that I should or could

9   consider in my 3553(a) calculation?  You can comment on that

10  if you'd like.

11      MR. CANTY:  I think that the expectation is that all

12  defendants should comply with the conditions of their

13  pretrial --

14      THE COURT:  Just answer me if you think it should

15  be --

16      MR. CANTY:  Yes, certainly.  That's a factor the

17  Court could consider, yes, Your Honor.

18      THE COURT:  When people have the opportunity to

19  engage in rehabilitation, that's something which perhaps

20  should be recognized, I guess.

21      MR. CANTY:  It should be noted, Your Honor, that the

22  defendant has admitted in his pretrial services interview that

23  he's abused alcohol while on pretrial release and that that's

24  an issue that needs to be addressed.

25      THE COURT:  He's obviously found some comfort in

SHERRY BRYANT, RMR, CRR

```
                        PROCEEDINGS                        11
```

 1  drinking a lot, given his circumstances, I imagine.

 2          So we have the addendum to the presentence report,

 3  which is dated March 24th.  And you have each, I assume,

 4  received that as well.  And basically, the Probation

 5  Department supports the government's position, talks about the

 6  use of zillow.com in calculating the loss amount in this case.

 7          We have the government's letter of April 15th, 2012.

 8  That talks about the forfeiture.  And maybe we can talk about

 9  that right now and get that out of the way, if it's possible

10  to do that, because the proposed order of forfeiture does talk

11  about the forfeiture of $7,461,708.70.

12          I have to make this calculation, but maybe Mr.

13  Miedel can tell me to what extent I have to engage in

14  extensive proceedings in order to agree or disagree with that

15  amount of money.  He obviously can't pay it.

16          MR. MIEDEL:  Obviously, he can't pay it.

17          THE COURT:  And there's no moneys that the

18  government has obtained so far to satisfy that forfeiture, I

19  take it as well.

20          MR. CANTY:  That is correct.

21          MR. MIEDEL:  The loss amount in this case is claimed

22  to be $231,000.  So the 7 million --

23          THE COURT:  No, I'm talking about is there a

24  difference between -- we'll get to that, for forfeiture

25  purposes.

PROCEEDINGS                                    12

1          MR. MIEDEL:  But the forfeiture amount appears to be

2    based on the government's view expressed in its letter that

3    there are all these other losses --

4          THE COURT:  You don't agree to the 7 million

5    dollars?

6          MR. MIEDEL:  Absolutely not.

7          THE COURT:  So let's put that to the side, the

8    amount of the loss.

9          So then we have the government's letters.  I

10   mentioned April 15, 2014.  I have also the government's letter

11   of May 13th, 2014.  And the addendum to the presentence

12   report, I should make reference to the fact that it

13   incorporates and relates to Mr. Miedel's objections to the

14   presentence report, as per his letter of March 10th, 2014,

15   where he basically takes exception to everything.  So we just

16   want to frame the circumstances here that we have to address.

17   All right.

18          So in the government's letter of April 15, as you

19   know, Mr. Miedel, as an experienced attorney, and in the

20   letter of May 13th, 2014, the government has set forth all

21   these other relevant conduct dynamics that it represents it

22   can establish if there were to be a hearing.

23          So, as you can appreciate, you're entitled to what

24   we affectionately call the hearing, right?  And the question

25   is whether you want it or you want to accept the government's

PROCEEDINGS                    13

1   representation, because I can't just pull this rabbit out of a

2   hat.

3           MR. MIEDEL:  Sure.

4           THE COURT:  I have to process it correctly.  My

5   sense is that they have relied upon these 20 other

6   circumstances as relevant conduct, and we know what the law is

7   about that.  I have to consider that when it's really part of

8   a common scheme, as this clearly is, in making the loss

9   calculations.

10          So the choice is yours.  If you want to put the

11  government to its preponderance of proof burden, we will have

12  a hearing.

13          MR. MIEDEL:  Well, Your Honor, you know, the trial

14  was about one property and a loss amount of $200,000, and then

15  the government sort of tries to backdoor in 7 million dollars

16  of loss and 20 other properties, which they couldn't prove to

17  a jury.  So --

18          THE COURT:  Well, we're going to stop that, because

19  this case interests me a little bit more than the run of the

20  mill cases, as you will ultimately find out.

21          But when you have a situation -- and I guess Mr.

22  Canty can address this, too, in the first instance -- where

23  instead of alleging these other 20 acts, which would then have

24  to be proved by the criminal standard of proof beyond a

25  reasonable doubt, you chose not to do that for whatever

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                              14

1    reasons even though you had all this evidence.  You decided to

2    go with one count of fraud, the Wells Fargo dynamic, and you

3    certainly proved that, no question about that.

4              But why is it that you didn't charge him with all

5    these 20 counts instead of relying upon the fact that we have

6    to now deal with them as relevant conduct at a lesser standard

7    of proof?

8              MR. CANTY:  Your Honor, that was -- charging

9    decisions are within the prerogative of the Department of

10   Justice and our office, and that decision was made to charge

11   the single property.

12             What -- the decision-making that went into that I

13   don't think is appropriate for the government to discuss,

14   certainly in front of a defendant, how and why we decide to

15   charge specific counts.

16             THE COURT:  The way you lay it out at page 4 and

17   page 5 and page 6 clearly rings the bell -- and page 7 -- as

18   relevant conduct.  I have no problem in drawing that

19   conclusion, that it's certainly part of his modus operandi,

20   part of the same scheme and part of the same operation.  He

21   wasn't just doing this one time; this was his business over a

22   period of time.  I have no problem with that at all.

23             But what strikes me also is that for guideline

24   purposes, it seems that the same punishment would be

25   applicable if these were 20 separate counts of conviction by

PROCEEDINGS                                    15

1   the higher burden of proof as if we are dealing with these

2   matters as relevant conduct with a lesser standard of proof.

3   It washes out to the same dollar value, does it not?

4           MR. CANTY:  If proven, yes, certainly.

5           THE COURT:  Does that trouble you at all that you

6   come to the same guideline calculation, be it by relevant

7   conduct at the lesser standard of proof compared to the higher

8   standard that would be applicable if you had to prove each of

9   these counts before a jury?

10          MR. CANTY:  In what capacity?

11          THE COURT:  The same guideline calculation.

12          MR. CANTY:  I understand that.  But --

13          THE COURT:  Does it trouble you at all that you can

14  get to the same place at the end of the line by a lesser

15  standard of proof?

16          MR. CANTY:  For purposes of sentencing?

17          THE COURT:  Yes.

18          MR. CANTY:  No, because ultimately, it will be the

19  Court's decision to render what the appropriate sentence is,

20  in light of the guidelines calculation and the --

21          THE COURT:  I understand that.  But I'm trying to be

22  honest with you to tell you that this troubles me a little

23  bit, because whether you use the higher standard which would

24  be applicable if they were also counts of conviction or the

25  lesser standard which is applicable by the relevant conduct

SHERRY BRYANT, RMR, CRR

```
                        PROCEEDINGS                    16
```

 1  route, you come to the same end of the line, don't you, same

 2  place?

 3              MR. CANTY:  I believe that it would be slightly

 4  different, because we would have grouping.  We would have

 5  grouping of separate counts.  So I believe that the guidelines

 6  would be slightly altered.  But yes, I accept the Court's

 7  position that the loss amount would be the same.

 8              THE COURT:  I'm just intellectually curious about

 9  these things.  Okay.  So the choice is yours.  I'm not going

10  to make a determination based upon the government's

11  representation, which I suspect they'll be able to establish,

12  unless you agree.  In other words, it's your call.  What else

13  can I do?

14              MR. MIEDEL:  We're not prepared to concede that Mr.

15  Turner participated or committed fraud or some sort of crime

16  in all of these properties.  And we also are not prepared to

17  concede the government's sort of guesstimate about the loss

18  amount, based on property values from a website.

19              I mean, I don't have any documents or records about

20  any of these.  So I don't know whether, for example, payments

21  were made back to the bank and, therefore, the loss is reduced

22  dramatically, or what.  So I'm not prepared at this point --

23              THE COURT:  I think we would need a hearing here.

24              MR. MIEDEL:  I would think so.

25              MR. CANTY:  Your Honor, we've prepared, at the

```
                        PROCEEDINGS                    17
```

1   Court's convenience, to do the hearing.  I will say that I
2   have had discussions with defense counsel and put this on the
3   record.  We've been willing to meet with defense counsel, sit
4   down and go through these properties specifically.  There are
5   certainly properties -- and I think just by a brief reading of
6   our explanation -- that there's overwhelming evidence, proof
7   beyond a reasonable doubt this defendant was involved in
8   fraud.  We're willing to work with defense counsel to go
9   through these properties individually.

10          The response that we've gotten is, we're not
11  conceding anything.  You put us -- we're going to put you to
12  your burden and we're going to do a hearing.  We're happy to
13  do that.  We certainly would like to expedite it, and that
14  would obviously change the loss amount.

15          But he's entitled to a hearing.  If he wants the
16  hearing, we'll come in with all of the evidence, and it's our
17  position that we can prove these 19 properties certainly by a
18  preponderance of the evidence.

19          It should be noted, Your Honor, that additionally,
20  in our review, there were two properties that we felt it was a
21  close call, we felt there was a possibility we would not be
22  able to prove by a preponderance of the evidence, and we asked
23  those not to be included.

24          But these 19 properties that are listed, we are
25  firmly convinced and satisfied by the evidence that we've

PROCEEDINGS                              18

1   reviewed and the testimony that we can proffer at a hearing.

2          THE COURT:  You must understand, from my

3   perspective, I have to conduct a proper proceeding and I just

4   can't pick out numbers out of the clear blue sky.  I have to

5   process this.

6          MR. CANTY:  I understand, Your Honor.  I just want

7   the record to be clear that we have reached out to defense

8   counsel to try to work -- come to a resolution.

9          THE COURT:  Usually these things are resolved by

10  some collective discussions, and it's rare that we have an

11  elaborate hearing, but the law says that's what I have to do.

12  I have no alternative.

13          Let's see.  The 7 million dollars brings in a 20

14  uptick.  What is the break point that makes it 20?

15          MR. MIEDEL:  It's 7 million.  The next one below

16  that is 2 and a half million, I believe.

17          THE COURT:  So it's just slightly over 7 million.

18  So it may well be that after you negotiate or discuss this

19  matter, it won't be 20 levels, it will be what, 18 levels?

20          MR. MIEDEL:  It would be 18 if it was between 2 and

21  a half and 7 million, but I'm not convinced of that number at

22  all.

23          THE COURT:  You're talking a small change.  What do

24  you want to do?  Do you want to set it down for a hearing?

25          MR. MIEDEL:  I think we should.  I think I need --

PROCEEDINGS                                    19

1   the government needs to supply me with all the documents

2   relevant to each of the properties. And look, maybe once I go

3   through them and -- you know, maybe we can reach a resolution.

4            THE COURT: I was hoping that you'd be able to have

5   done that prior to sentencing. I mean, it's been out there

6   since October. Nothing prevented you from doing this before.

7            MR. MIEDEL: True.

8            THE COURT: No other pressing business, right?

9            Let me just finish what I have in the file here. I

10  have Mr. Miedel's submission of April 4th, 2014 plus all these

11  letters of recommendation attached to it.

12           I previously mentioned Mr. Miedel's letters

13  objecting to the presentence report of March 10th, 2014. I

14  have the stipulation and waiver of jury trial with respect to

15  the forfeiture matter. And I think that's it. Is there

16  anything else that I ought to have?

17           MR. MIEDEL: I think that's it.

18           THE COURT: So at least we've started the process

19  today.

20           MR. CANTY: Your Honor, there was a letter from the

21  victim in this case. I believe it was turned over to --

22           THE COURT: Just today?

23           MR. CANTY: Yes, today.

24           THE COURT: The victim is not in court?

25           MR. MIEDEL: She testified at the trial.

PROCEEDINGS                    20

1    THE COURT:  Oh, yes.  So this is from Dana Marano.

2   I remember her testimony.  Yes.  All right.  So you received a

3   copy of this?

4            MR. MIEDEL:  Today, yes.

5            THE COURT:  So we have that as part of the file as

6   well.

7            All right.  So we started the sentencing proceeding

8   by at least now identifying the documents which we have, and

9   then we undoubtedly will have other things to consider in the

10  future.

11           So I want to try to have this concluded before my

12  summer vacation, which will start July 1st.  So let's set this

13  down for a hearing.  The government is prepared to go forward?

14           MR. CANTY:  Certainly.

15           THE COURT:  So I think mid June would give you ample

16  time to focus on all of this, Mr. Miedel.

17           MR. MIEDEL:  Yes, that's fine.

18           THE COURT:  Inform the Court whether you think a

19  hearing is really necessary.

20           MR. MIEDEL:  Sure.

21           THE COURT:  Let me know in advance of that date, if

22  you can, as soon as possible.  All right?  So let's set this

23  down for maybe the second week of June, Mr. Innelli.

24           MR. CANTY:  Your Honor, can we have the week of the

25  16th, is that possible?

PROCEEDINGS                              21

1         THE COURT:  Go off the record while we find a proper

2    date.

3              (Pause in the proceedings.)

4         COURTROOM DEPUTY:  That would be Tuesday, June 17th

5    at 11 a.m. for a Fatico hearing.

6         THE COURT:  Right.  Well, it's going to be for

7    sentencing and hearing, if necessary.  And I'll be advised by

8    counsel before then whether there's going to be a hearing.

9    You have to let me know.  Try to let me know, if you can, a

10   week before so we can have everything lined up.

11        MR. MIEDEL:  That's fine.

12        THE COURT:  Anything else we need to attend to

13   today?

14        MR. CANTY:  Your Honor, will we address the other

15   objections, defense objections on that date, or would you

16   prefer to address them today?

17        THE COURT:  I think we should really deal with

18   pinning down what facts are in dispute.  There's no need to

19   address things if there are disputed issues that have to be

20   resolved, right?  So let's pin down all of the facts that we

21   have and then we'll just have oral argument about those facts

22   once you establish them, okay?

23        MR. CANTY:  Yes, Your Honor.

24        THE COURT:  I'll see you then.

25        MR. CANTY:  Thank you.

PROCEEDINGS                                        22

1          MR. MIEDEL:   Thank you.

2          (Whereupon, the matter was concluded at 12:48 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHERRY BRYANT, RMR, CRR

23

1          I certify that the foregoing is a correct

2   transcript from the record of proceedings in the

3   above-entitled matter.

4

5                    /s/ Sherry Bryant
                     Sherry Bryant, RMR, CRR
6                    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHERRY BRYANT, RMR, CRR

1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------------------x
     UNITED STATES OF AMERICA,
3                      Plaintiff,

                                         12 CR 326
4

5              versus          United States Courthouse
                               225 Cadman Plaza East
6    BENJAMIN TURNER,          Brooklyn, N.Y.  11201

7
                     DEFENDANT.
8
     ------------------------------------------x
9
                                    June 17,  2014
10                                  11:15 a.m.
               TRANSCRIPT OF ORAL ARGUMENT
11   Before:  HON. FREDERIC BLOCK,
                               DISTRICT COURT JUDGE
12
                         APPEARANCES
13
     LORETTA LYNCH
14   United States Attorney - Eastern District of New York
     271 Cadman Plaza East
15   Brooklyn, New York  11201
     BY:      MICHAEL CANTY, ESQ.
16            DAVID PITLUCK, ESQ.
     Assistant United States Attorneys
17

18   ATTORNEY FOR DEFENDANT:

19   FLORIAN MIEDEL, ESQ.

20

21
     Reporter:  ALLAN R. SHERMAN, CSR, RPR
22                   225 Cadman Plaza East Rm 374
                     Brooklyn, New York  11201
23            Tel: (718) 613-2529  Fax: (718) 613-2630

24

25   Proceedings recorded by mechanical stenography, transcription
     by CAT.
          ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
        United States District Court  Eastern District of New York

Sentence                                                    2

1          THE CLERK:  Criminal cause for sentencing, United

2    States of America versus Benjamin Turner, docket number 12 CR

3    326.

4          Counsel, please state your appearances for the

5    record.

6          MR. CANTY:  Michael Canty and David Pitluck for the

7    government.

8          MR. MIEDEL:  Florian Miedel for Mr. Turner.

9          THE COURT:  When we left last time, we had to decide

10   whether we would have a Fatico hearing or not since defense

11   counsel posed significant objections to relevant conduct, et

12   cetera, and I understand that you folks have been talking to

13   each other so I need to know first thing, what we are going to

14   do about that.

15         MR. CANTY:  Your Honor, I have had discussions with

16   defense counsel and at the Court's suggestion, we met, we sent

17   additional material to defense counsel with respect to certain

18   properties.  And without getting into the details of the

19   negotiation, we have agreed to certain adjustments to the

20   defendant's guidelines calculation based on points that should

21   be included.

22         If you like, I can go through --

23         THE COURT:  I take it we are not going to have a

24   Fatico hearing as a result of this?

25         MR. CANTY:  That's my understanding, your Honor.

Sentence

1          MR. MIEDEL:  Yes.

2          THE COURT:  So we have this laundry list of 20 or so

3    alleged similar relevant conduct.  So do you want to tell me

4    where we are at right now.  I am looking at the presentence

5    report.  We identified last time we were here all the

6    documents that I have in my file.

7          MR. CANTY:  Yes.

8          THE COURT:  That's where we left off.

9          MR. CANTY:  If it may be easier for the Court, I

10   have a list of the properties that we agree the defendant is

11   not going to contest and I can give you the total amount.

12         THE COURT:  Do you have a piece of paper that I can

13   add to my sentencing file as well as articulating what it is?

14         MR. CANTY:  I can.  I have given a copy to defense

15   counsel.

16         THE COURT:  I'd like to see it as we go along.

17         So we should make sure that we have this properly

18   marked as part and parcel of the Court's sentencing file.  I

19   can just say this will be Exhibit A to the presentence report,

20   okay.

21         MR. CANTY:  Thank you, your Honor.

22         THE COURT:  So we have now a total of $5,477,529.90.

23         MR. CANTY:  That's correct, your Honor.

24         THE COURT:  That is the total loss amount based upon

25   14 properties, right?

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

Sentence                                      4

1          MR. CANTY:  Yes, your Honor.

2          THE COURT:  And plus the one count of conviction

3    would make 15.

4          MR. CANTY:  I believe that that might be included on

5    the list.

6          THE COURT:  Where would that be?

7          MR. CANTY:  Actually, it's not on this list so you

8    are correct.

9          THE COURT:  So that would be an additional 230,000

10   which probably won't affect the guideline calculation.

11         MR. CANTY:  It does not, your Honor.

12         THE COURT:  So we have a total loss of somewhere

13   about approximately 2-million-5.7, I guess, roughly.

14         MR. CANTY:  Yes, your Honor.

15         MR. MIEDEL:  Your Honor, we take issue with a few

16   little things here and there but it doesn't affect the

17   guideline range.

18         It's above 2.5 million which is the lowest, the next

19   level, so we won't contest whatever number it is that we

20   ultimately agree to.

21         THE COURT:  You agreed to this figure of

22   5,477,529.90, correct?

23         MR. CANTY:  Yes, plus the 230,000.

24         THE COURT:  Then there is 230,000 maybe 231.  Let's

25   round it out to 230,000 for the count of conviction.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

5

Sentence

1      MR. CANTY:  That total amount is $5,707,529.90.

2      THE COURT:  So we are talking about 5,700,000.

3      Let's see how that affects the calculation.  Let's

4  try to make our calculations now based on that new

5  information.

6      Turn to page 10.  The base offense level of seven

7  remains.  I take it there is no issue with that, is that

8  correct?

9      MR. MIEDEL:  That is correct.

10      THE COURT:  And then I suspect that under 22, the

11  specific offense characteristics will be reduced to level 18

12  instead of 20?

13      MR. CANTY:  Yes.

14      MR. MIEDEL:  Yes.

15      THE COURT:  That is predicated upon in loss amount

16  which the parties have agreed upon.

17      Now, as far as the specific offense characteristics,

18  at least ten victims, we obviously have that now.

19      MR. MIEDEL:  We don't, your Honor.  Actually, we

20  have agreed that does not apply because some of the properties

21  involved the same bank so it's the same victim.

22      MR. CANTY:  That's correct, your Honor.

23      THE COURT:  So we don't have that?

24      MR. CANTY:  That's correct.

25      THE COURT:  So we can't add two levels to that?

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

6

Sentence

1           MR. CANTY:  That's correct.

2           THE COURT:  So we agree with that.

3           How about the next one, the shell corporation.  I

4    think that still exists.

5           MR. MIEDEL:  We agree with that.

6           THE COURT:  These monies by and large were sent to

7    the shell corporation.

8           MR. CANTY:  Yes, your Honor.

9           THE COURT:  We have to talk about what happened to

10   all these monies.

11          So that two levels stays.

12          Obviously, the defendant derived more than 1 million

13   in gross receipts.  That stays.

14          MR. MIEDEL:  No, it does not because the guideline

15   itself, the defendant himself, not every one in the scheme has

16   to derive more than a million dollars from an institution.

17          THE COURT:  You have no idea how much he derived?

18          MR. MIEDEL:  The government agrees that that one

19   does not apply.

20          MR. CANTY:  A lot of these transactions were done

21   through the shell corporation and then there was cash

22   disbursed to other individuals.

23          We cannot prove by a preponderance of the evidence

24   that the personally gained over a million dollars.

25          THE COURT:  Money went out from the shell

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

7

Sentence

1    corporation to lots of different people?

2            MR. CANTY:  That's correct.

3            THE COURT:  You don't know how much of it stuck with

4    the defendant?

5            MR. CANTY:  We could not prove that by a

6    preponderance of the evidence.

7            THE COURT:  Was there any way of knowing, the checks

8    which came from the shell corporation to certain payees, did

9    the government make any determination as to what happened to

10   the funds?  Millions of dollars were put in shell

11   corporations.

12           MR. CANTY:  A lot of that money can be traced but

13   for this guideline calculation -- enhancement, we specifically

14   have to prove that he personally kept $1 million.

15           We know that money was diverted to a coworker of his

16   who he had a relationship with, also to his wife, but those

17   numbers did not reach, we could not definitively prove that it

18   went over $1 million.

19           THE COURT:  I'm troubled, quite frankly, about now

20   we have $5.7 million of money that has disappeared and Mr.

21   Turner is responsible for this.

22           There is no question that is all relevant conduct.

23   I'll make that determination now clearly.

24           Apparently, there is not going to be any issue about

25   that, you don't want a Fatico hearing, but from all the

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

1-30

8

Sentence

1   information that was presented to me and the trial that I

2   listened to carefully and all the evidence that was presented

3   at the trial, this is all part of a common scheme over a

4   period of years and Mr. Turner was the hub of this.

5          So clearly, it's relevant conduct.  You have the

6   Siegel events.  This behavior took place over a period of

7   three years.  So it's clearly relevant conduct, part of the

8   same common scheme and plan.  But you can't tell me where this

9   money went from the shell corporation to.

10         How much went to his wife?

11         MR. CANTY:  I don't have those specific numbers.  I

12  know that he had to pay off other members of the conspiracy.

13  For example, he had to pay inflated appraisals.  He had to pay

14  straw buyers.

15         THE COURT:  He had expenses?

16         MR. CANTY:  Correct.

17         THE COURT:  But certainly some money had to stick to

18  him or his wife or he hid some of this money?

19         MR. CANTY:  I think the defendant is in the best

20  position to know where that money is.

21         THE COURT:  The defendant will be given an

22  opportunity to speak about that because that is something that

23  I'm seriously concerned about in terms of weighing the 3553(a)

24  factors.

25         So I'll give him an opportunity to tell me what I

9

Sentence

1    should think about that.

2         Let's make our calculations.

3         He is not going to have two more levels for the

4    alleged $1 million in gross receipts. The government doesn't

5    know how much money stuck to his fingers.

6         MR. CANTY:  The issue is proving it.

7         THE COURT:  I understand that.

8         Now, how about if the defendant was an organizer or

9    leader?  I suspect that still stays.

10        MR. CANTY:  That is the government's position.

11        MR. MIEDEL:  We contest that.

12        THE COURT:  Do you want to have a hearing?

13        MR. MIEDEL:  We don't want to have a hearing.  We

14   can argue that.

15        MR. CANTY:  The government believes it can prove he

16   was a leader of five or more individuals based on the

17   testimony at trial.

18        THE COURT:  Let's count it so we have a clear record

19   here since it's not being agreed upon.  I remember at the

20   trial, you had a lot of it at your fingerprints.

21        MR. CANTY:  Mr. Pitluck can discuss the individuals

22   that the defendant lead in the scheme.

23        THE COURT:  It can be otherwise extensive as well.

24        MR. CANTY:  Yes, your Honor, but just for the

25   purposes of that enhancement, we believe the testimony alone.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

10

Sentence

1 Certainly we can introduce other evidence.

2          THE COURT:  That is my recollection.

3          MR. PITLUCK:  It' summarized in our letter on page 8

4 but as your Honor heard at trial, the testimony established

5 that defendant lead Kent Hokai, a witness who testified at

6 trial that said he performed acts at the request of the

7 defendant 490 Ross Corp. including soliciting appraisals,

8 signing documents.  And your Honor will recall also that

9 through Mr. Hokai the government introduced a recording of the

10 defendant talking about acts he had committed with Mr. Hokai

11 and many others, including one of the other people he led,

12 Edmond Berokheim who was a hard money lender who at Mr.

13 Turner's request gave loans that had no documentation.

14          THE COURT:  That is two.

15          MR. PITLUCK:  Your Honor, Charles Brown, the

16 appraiser who testified at trial.

17          THE COURT:  That is three.

18          MR. PITLUCK:  Your Honor, Jacob Vesil who was a

19 codefendant in the case.

20          THE COURT:  That is four.

21          MR. PITLUCK:  And, your Honor, there would be the

22 office staff members that as Dana Morano testified, she was

23 induced to sign in the defendant's office.  She identified

24 that there were multiple people there, your Honor.

25          THE COURT:  That is five.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

11

Sentence

1          MR. PITLUCK:  And your Honor, I'm forgetting one

2    more.

3          THE COURT:  You have five.

4          It was clearly extensive in any event.  It was this

5    complex scheme that lasted for a period of time.

6          MR. MIEDEL:  Judge, can I speak?

7          THE COURT:  What is your argument?

8          MR. MIEDEL:  My argument is, as you recall, this was

9    not some sort of hierarchal organization with a leader,

10   supervisor, a boss.  This was at best a loosely sort of

11   organized scheme where lawyers were hired for certain things,

12   they received their cut.  Kent Hokai, the testimony was he

13   worked for an individual named A.L. Cohen, he didn't work for

14   Mr. Turner.  He was on tape discussing deals they were

15   allegedly involved in but there was not evidence that Mr.

16   Turner supervised or lead or somehow managed Mr. Kent Hokai.

17         THE COURT:  The problem is when you get these

18   presentence reports, they, come late unfortunately because

19   probation doesn't have enough money to give us expeditious

20   reports so we have to do the best we can with these

21   unfortunate circumstances.  But he was pretty extensively

22   involved in this activity.

23         MR. MIEDEL:  Yes, but that is not the issue.  The

24   issue is whether he deserves four points, the highest level,

25   for leadership.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

1-34

12

Sentence

1          THE COURT:  Or otherwise extensive.

2          MR. MIEDEL:  Otherwise as a leader.  Just because he

3    allegedly worked with other people in a scheme doesn't mean he

4    was their leader.

5          THE COURT:  What do you think, two levels is what is

6    appropriate?

7          MR. MIEDEL:  I think at most, two levels is

8    appropriate.

9          THE COURT:  What do you say about that?

10         MR. PITLUCK:  I think the four level enhancement is

11    appropriate.  As your Honor heard during trial, numerous

12    witnesses testified that the defendant was the one who

13    gathered all the parties, who hired the attorneys, who set up

14    all the transactions.

15         THE COURT:  That is my recollection, but then we

16    have a three-level somehow in between that may be more

17    appropriate here if he were not a leader but it was otherwise

18    extensive.

19         MR. MIEDEL:  I believe the evidence showed Mr.

20    Turner received a $10,000 payment on this deal.  And there are

21    others that received higher payments in this case and there is

22    just no evidence that he was somehow the head of this whole

23    thing and the organizer who put it all together.

24         At best, I think the evidence was that there was

25    participation and that's what the enhancement is for.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

13

Sentence

1          THE COURT:  I would like to err on the side of being

2     cautious.  We don't want to have this case sent back by the

3     Circuit Court.

4          Let's look at what 3B1.1A says.  So based on the

5     defendant's role in the offense, you increase the offense

6     level as follows; A, he was the organizer or leader that

7     involved five or more people or was otherwise extensive.

8          He has to be an organizer or leader for that to be

9     appropriate.

10          B, the defendant was a manager or supervisor, not an

11    organizer or leader and the criminal activity involved five or

12    more people or was otherwise extensive.

13          That may fit here.  I don't know.

14          C, if he was an organizer, leader, manager,

15    supervisor in any criminal activity.

16          I'm going to give him two levels because we all

17    agree that at the very least, there is a two level enhancement

18    that is applicable here.

19          Correct, Mr. Miedel?

20          MR. MIEDEL:  Yes.

21          THE COURT:  Then 28, I think that stays.

22          MR. MIEDEL:  Yes, we don't object.

23          THE COURT:  You are not going to object to that.  He

24    was a lawyer.  He used special skills in making this all

25    happen.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

14

Sentence

1        So the adjusted offense level now, let's add it up.

2        MR. MIEDEL:  31, your Honor.

3        MR. CANTY:  31.

4        THE COURT:  I have 33.

5        What am I missing?  Seven plus 18 is 25 plus 2 is 29

6   plus another 2 is 31 plus 2 is 33.

7        MR. MIEDEL:  18 plus seven is 25, not 27.

8        THE COURT:  Sorry, 25, 27.  It is 31 instead of 33,

9   correct?

10       MR. CANTY:  Yes, your Honor.

11       THE COURT:  We have a criminal history category of

12  one.  So the total offense level is going to be 31 and that

13  gives us an advisory guideline range of from 108 to 135,

14  right?

15       MR. PITLUCK:  Yes, your Honor.

16       THE COURT:  Are we all agreed on that?

17       MR. MIEDEL:  Yes.

18       THE COURT:  So we have taken care of that.

19       Then of course he had 24 months mandatory in

20  addition to that for the identity theft.

21       So now that we have decided that, let's talk about

22  what troubles me somewhat specifically, which is where the

23  money went to.

24       There is nothing here that gives me any information

25  about where this money went to.  It's hard for me to believe

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

15

Sentence

1  that Mr. Turner was so culpable here and winds up filing an

2  affidavit that he can not afford counsel.

3       Now, in the past, I rejected the request by the

4  government to make this affidavit available to the government

5  because there is something in our CJA plan and in the law that

6  suggests that the government should not have the affidavit

7  available to it because it arguably could compromise the

8  integrity of counsel or his rights to have effective counsel

9  with all that governmental interference.

10       So we acted with caution with respect to that.  Of

11  course, after the case is over, the Court has all sorts of

12  powers to make inquiries here, refer this matter to the United

13  States Attorney because it troubles me a great deal here.

14       Mr. Turner stands before me after being involved

15  with being part of the $5.7 million fraud upon a number of

16  banks and says that he has no money, he can't pay for counsel.

17       I don't know where the money went but, Mr. Miedel,

18  I'm going to let you tell me what you want me to do about

19  this.  It troubles me greatly.

20       I spoke to probation.  We have our probation officer

21  here.

22       Your appearance.

23       PROBATION OFFICER GUTMAN:  Steven Guttman from the

24  U.S. Probation Department.

25       THE COURT:  And Mr. Gutman has no knowledge as to

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

16

Sentence

1  where this money went.  I have no knowledge as to where the

2  money went.  As a matter of just common sense, it's hard for

3  me to believe that Mr. Turner did not wind up with my money.

4       It's up to you Mr. Miedel.  Where did this money go?

5  You tell me what you want me to do, what you want to say, if

6  you want an adjournment, some time to submit papers to show

7  where this money went to show that your client truly never got

8  any of this money.

9       It's hard for me to believe.  It just doesn't make

10  common sense.  It's up to you.  Do you want some additional

11  time to think about this?  I'll give it to you.

12       MR. MIEDEL:  Well, the difficulty is in some ways

13  that the 99, I don't know the exact percentage but 90 plus

14  percentage of the loss amount comes from conduct that is

15  alleged that wasn't part of the trial.

16       THE COURT:  I understand.

17       It's relevant conduct.

18       MR. MIEDEL:  It's relevant conduct.  So we decided

19  not to have a hearing on it and we were not contesting the

20  amount.

21       THE COURT:  Let me interrupt here.

22       We know that substantial monies went to Four

23  Dolphins, his shell corporation, that we know.  What happened

24  after that, I have no knowledge of that.

25       MR. MIEDEL:  For example, on this property that was

17

Sentence

1 the subject of this case, it's my understanding that Mr.

2 Turner made about $10,000.

3      THE COURT: That may be the case. I don't know.

4 That's what you tell me.

5      MR. MIEDEL: So we have a number of different people

6 involved in these transactions, all who are going to make some

7 portion of whatever proceeds there are. So I don't think

8 we're talking about a personal gain of millions.

9      THE COURT: Four Dolphins was his shell corporation.

10 Monies were funneled into that, millions, unaccountable.

11 Where did they go?

12      It's up to you. I'll give you an adjournment if you

13 need it if you want to talk to your client about it because I

14 think that it's hard not to consider that when it comes time

15 to pick the right number for incarceration purposes. And I

16 want to give you every opportunity to think about it because

17 it's a big factor in my head. The money is unaccounted for.

18 I'm not suggesting that he should be in a position where his

19 Fifth Amendment rights are adversely affected. I'm just

20 giving you the opportunity if he wants to avail himself of it.

21      MR. MIEDEL: Can we have a moment, your Honor?

22      THE COURT: Take all the time you like.

23      (Pause.)

24      THE COURT: You see, Mr. Miedel, of all the people

25 in this courtroom, he knows what happened to this money.

Sentence

1          MR. MIEDEL:  Right.

2          THE COURT:  It may be that he gave it all to

3     charity.  Maybe he gave part to his wife.  Maybe he had a lot

4     of coconspirators that he had to pay money to but I don't

5     know.  And the government for some reason hasn't been able to

6     trace this money.  I don't know why not.

7          It's up to you.

8          MR. CANTY:  Your Honor, just point of clarification.

9     We can trace some of the money.  This is the problem that we

10    have.  We have witnesses that have identified the defendant as

11    being kind of a facilitator at these closings.

12         One witness in particular stated that he went to

13    great lengths to make sure he was paid cash so obviously that

14    is untraceable.

15         We also know through his bank accounts, Four

16    Dolphins, other coconspirators were paid, hard money loans

17    were repaid but there are routine payments made to the

18    defendant just under $10,000, payments to his wife.

19         THE COURT:  Look, the monies went into --

20         MR. CANTY:  $9,000, $9,000, $9,000, money to a

21    coconspirator that he worked with, Nadia Aleen, $9,000,

22    $8,000, payments to himself.  Those certainly not getting

23    close to a million dollars.

24         We also had a witness that said the defendant took

25    cash payments at these closings.  Obviously that is not

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

19

Sentence

1   traceable.

2           THE COURT:  But the money that went into Four

3   Dolphins, I assume you have records of that?

4           MR. CANTY:  We do.

5           THE COURT:  And I assume you can show where the

6   monies went from Four Dolphins, how they were disbursed.  I'm

7   surprised you don't have that information.

8           MR. CANTY:  We can get that information for the

9   Court.  I know a lot of money was paid out to coconspirators

10  to pay back the hard money loans.

11          THE COURT:  He had a lot of obligations.

12          MR. CANTY:  Also payments to himself his wife and an

13  associate at work.

14          THE COURT:  You understand why I have these

15  concerns?

16          MR. MIEDEL:  I understand completely.  And we can

17  probably come together in terms of figuring out how much money

18  he paid himself and his family.

19          I don't think it's going to amount to a tremendous

20  amount.

21          MR. CANTY:  This is what troubles the government,

22  your Honor.  When the defendants was arrested, his

23  coconspirator came and wanted to be a surety.  She claimed

24  that she worked as a secretary for the defendant and made over

25  a hundred thousand dollars a year.  Then at the same time he

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

20

Sentence

1  is coming before the Court, he later comes before the Court

2  and says I don't have any money.

3         So there is money there.  This is a woman that had

4  essentially no skills other than she acted as a signee or

5  assisted in these closings.  We know she facilitated in the

6  forgery of that Barry Rosen Notary stamp that we talked about

7  from one of the deals.

8         THE COURT:  The person who is really in charge of

9  uncovering all this mystery is right here in court before me

10  today and he can speak or not speak as he chooses, but I also

11  have a very difficult time based upon everything that I have

12  in front of me to believe that he did not submit another phony

13  affidavit here, namely, the affidavit that triggered the

14  assignment of counsel free of charge.

15         MR. MIEDEL:  As you can see from the presentence

16  report, he also has a tremendous amount of financial

17  liabilities.  There are money judgments against him already in

18  a number of different cases.

19         So he has major liabilities even if he were -- which

20  is all set out in the report.

21         MR. CANTY:  What also troubles the government, one

22  of the properties that he conceded, that he is not contesting

23  is the 595 Elm Street in West Hempstead.  That was a property

24  where the defendant assisted his coconspirator in structuring

25  money, payments just under $10,000 so that she could purchase

21

Sentence

1   a house in excess of $500,000.  This is an employee of his.

2   She is living in the house, able to make her mortgage payments

3   and purportedly was working for the defendant making over a

4   hundred thousand dollars a year and he used his IOLA account

5   as the collateral when filling out the mortgage application.

6   That was the fraud on that property.

7          THE COURT:  There is a lot of things here.  When you

8   are dealing with fraudulent behavior, it's hard to follow the

9   bouncing ball.  The very essence of fraud is to cover things

10  up.

11         I think one of the things that I am obliged to do

12  after I render the sentence is to refer the financial

13  affidavit to the government.  I think I may have an obligation

14  to do that under the circumstances of this case, but we'll put

15  that to the side.

16         What do you want me to do, Mr. Miedel, today?

17         This is an open, honest conversation here.  I'm

18  trying to give you all the information I should have before I

19  render sentence.

20         MR. MIEDEL:  Sure.  My client had records that we

21  can go through and figure out where the money from Four

22  Dolphins went and how the payouts went.  I think the

23  government has much of that already.  And you can see, even if

24  it's not down to the precise dollar, you can see the general

25  sense of how much money went in and how much money went out.

GA45

22

Sentence

1          THE COURT:  If you want a reasonable adjournment to

2    put together some information to submit to me for my

3    consideration I'll certainly give you that time.

4          MR. MIEDEL:  Okay.

5          THE COURT:  But I want to do this before July 1

6    because otherwise, the summer begins and I will not be here.

7          MR. MIEDEL:  That is only next week.

8          THE COURT:  How much time will it take?

9          MR. MIEDEL:  We're talking about 20 properties -- 16

10   properties here with a number of different files.  I don't

11   think we can get this done in a week.

12         THE COURT:  Mr. Canty.

13         MR. CANTY:  The concern we have is obviously he is

14   taking cash payments.

15         THE COURT:  I'll put this down for -- today is the

16   17th.  I guess we can put it down for the 26th or the 25th,

17   either one.

18         MR. MIEDEL:  Not the Wednesday.

19         THE COURT:  I'm going to sentence him on the 26th.

20   I'll give you until that time to get me whatever you want.

21             I'm giving you another 10 days here, nine days.

22             We can do it the morning of the 27th.

23         MR. CANTY:  The government is not available the

24   27th.

25         THE COURT:  Just one second here.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

Sentence                                                    23

1              Off the record.

2              (Discussion off the record.)

3              THE CLERK:  Wednesday, June 25th at 11:30.

4              THE COURT:  Now, I urge you, Mr. Miedel, to get

5      whatever information you want to submit to me and obviously

6      the government before that so that I can properly consider it

7      but we really understand what we are trying to accomplish

8      here.

9              MR. MIEDEL:  Right.

10             THE COURT:  And I just need in fairness to your

11     client all the information.  I don't want to guess about

12     things and feel that I am ascribing to him more money than he

13     actually took, than he has.

14             I understand about the cash payments but I'm giving

15     you the opportunity to make your best effort to come clean.

16             MR. MIEDEL:  Cash payments were not much.  We are

17     talking about 2,500, $3,000 at a closing.

18             THE COURT:  I don't know.  And the government can

19     submit whatever papers it has as well.  So each of you will

20     have the opportunity to submit papers.

21             Please get them in before the 25th so I can read

22     them.

23             MR. CANTY:  Your Honor, the other concern, and

24     certainly we'll address this in our submission.  For example,

25     there were other payments to other coconspirators that came in

                ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
          United States District Court  Eastern District of New York

24

Sentence

1   the form of a brokers fee where there were kickbacks.

2         THE COURT:  How do I know that?  I can't speculate

3   here.  But I'll get a feel for it all.

4         Submit whatever you want to submit and we'll have an

5   open discussion about it on the 25th before sentence is

6   imposed.

7         All right?

8         MR. CANTY:  Yes, your Honor.

9         MR. MIEDEL:  Yes.

10        THE CLERK:  Judge, did you want probation back on

11  the 25th?

12        THE COURT:  Does probation have anything that can

13  help here?

14        PROBATION OFFICER GUTMAN:  Probably no.

15        THE COURT:  You did a good job.  I appreciate your

16  help.  I'll leave it up to you if you want to come back.  I

17  wanted you here today in case there was something that you

18  wanted to say or something additional that you had but if you

19  have nothing else to offer, you don't have to be imposed upon

20  to come back.

21        PROBATION OFFICER GUTMAN:  Thank you, your Honor.

22        THE COURT:  We'll see you then.

23        (Matter concluded.)

24

25

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter
United States District Court   Eastern District of New York